[No. 22316. *En Banc.* September 22, 1930.]

THE STATE OF WASHINGTON, *Respondent,* v. GEORGE SCHNEIDER, *Appellant.*[1]

[1]Reported in 291 Pac. 1093.

*H. B. Noland,* for appellant.
*W. G. Coleman,* for respondent.

BEALS, J.—Defendant was, by information, charged with the crime of murder in the first degree committed upon the person of his wife, Eva M., or Betty, Schneider, whom he assaulted on March 31, 1929, striking and cutting her with a heavy meat axe or cleaver, inflicting upon her wounds from which she died within a few hours. To the information, defendant pleaded not guilty, filing also a special plea in which he alleged that, at the time of the alleged commission of the crime charged, he was "insane and mentally irresponsible." On the trial, defendant did not deny that he had made the assault upon his wife, but rested his entire case upon his special plea of insanity and mental irresponsibility.

The trial resulted in a verdict of guilty, together with a finding that the death penalty should be inflicted. From a judgment of guilty entered upon this verdict, directing that defendant be executed, he appeals.

The facts leading up to the tragedy, briefly stated, were as follows: At the time of trial, defendant was fifty-six years of age. When twenty-four years old, he came to Spokane and went to work in a brewery, being promoted from time to time until he reached the

position of foreman. During this period, he married, two children being born of the marriage. His first wife dying while his children were still young, appellant married again, losing his second wife after a short period. Appellant then brought up his children himself in such a manner as to reflect credit upon all concerned. His friends and neighbors in Spokane testified on his trial to appellant's good character and to his excellent reputation as a good citizen.

In 1912 appellant removed to Walla Walla, where he was employed in a brewery, where he worked steadily up to the time of the killing, most of the time as cellar man. His employment by the two breweries continued from 1897 to March 30, 1929, with the exception of two years, during which the Walla Walla brewery was closed, during which interval appellant was employed at Kennewick by a company engaged in the preparation of grape juice for the market. Appellant owned his own home in Walla Walla, where he, for some time prior to his third marriage, lived alone, his children having established homes of their own. This home was clear from incumbrance, located on a half acre of land, and in addition appellant had saved a little over eight hundred dollars in cash.

October 1, 1928, appellant went to Seattle to visit his daughter, meeting en route a young man named Al Landers, who, after appellant's return to Walla Walla, called on him, bringing with him one Eva M., or Betty, Beavers, a young woman of immoral character, who, at least at times, indulged in intoxicating liquor to excess, and who was probably, at the time she was introduced to appellant, living with Landers. During the fall of 1928, appellant saw this woman from time to time, and, notwithstanding the fact that he was well aware of her immoral character, he, Jan-

uary 12, 1929, married her upon her promise to behave herself in the future.

If the woman ever had any intention of keeping her promise "to be good," as stated by appellant, her promises 'were speedily forgotton, as, almost immediately after her marriage, she again associated with Landers and conducted herself in a disorderly and outrageous manner. She very soon went to Seattle, where she probably lived for a while with another man, who leaving her stranded, she wrote appellant for money to come home. He sent her the money and she did go to Walla Walla, but remained in town two days before appellant learned of her arrival, he finally discovering her at a hotel in a drunken condition and taking her home.

It appears that appellant, either before or after his marriage, had contracted syphilis from his wife, and by the end of March his capital had been reduced to two dollars. It is evident that he was madly infatuated with Betty, and that he had spent all his money upon her, buying her good clothes and endeavoring to gratify her whims in an effort to cause her to be content to live with him decently as his wife. During this period, Betty's dissolute friends frequented appellant's home, leading appellant to drink to excess, arousing his jealousy by the improper liberties which they took with his wife, often before his very eyes, and changing his heretofore regular life into a disordered and dissipated existence, causing certain changes in his character and habits which were noticeable to his friends and associates.

On Sunday, March 31, appellant and his wife were in their home entertaining friends and acquaintances, the revelry continuing well into the evening. At about 9:30 o'clock, p. m., the guests having departed, appellant's wife prepared to leave the house, having

508

received a telephone call from Landers, who had just been released from jail, asking her to come up town, as he wanted to see her. It appears from the testimony that, at this time, appellant attacked his wife with the cleaver, inflicting upon her seventeen separate wounds, the walls of the house showing the marks of ten or eleven other blows. From the wounds then inflicted upon her, Mrs. Schneider died within a few hours. Appellant, after attacking his wife, went to the home of a neighbor and telephoned a surgeon to come to attend his victim.

Appellant moved for a change of venue upon the ground that he could not receive a fair trial in Walla Walla county because of local prejudice against him. It seems that two other murders had been committed in that county not long prior to the killing of Mrs. Schneider, and appellant contended that, due to this situation, and the fact that the local newspapers had given considerable publicity to his attack upon his wife, together with the fact that she was young and pretty, it was impossible for him to receive a fair trial in his home county. Affidavits were filed by appellant in support of his motion for change of venue, and counter-affidavits were filed on behalf of the state. The assault committed upon appellant's wife was a peculiarly brutal and atrocious one. Her body was cut and hacked well nigh to pieces in a most cruel and barbarous manner. Such a crime naturally created considerable excitement in the community in which it occurred, and naturally the published accounts thereof created a good deal of prejudice against the murderer. It does not appear, however, that a situation had resulted which would prevent appellant from receiving a fair trial before an impartial jury. The trial court was in an excellent position to understand the situation, and his ruling upon such a question should not

be disturbed upon appeal unless it clearly appears that an erroneous ruling was made, which, it must be presumed, resulted in prejudice to the accused. *State v. Schafer,* 156 Wash. 240, 286 Pac. 833. Careful consideration of the record upon this question satisfies us that the trial court did not err in denying appellant's motion for a change of venue.

▮ Appellant argues that his special plea, in which he pleaded that, at the time of the alleged crime, he was suffering from

". . . insanity and mental irresponsibility to such a degree and of such a nature as to render him incapable of having a criminal intent, and that then he was mentally irresponsible,"

alleges two distinct mental states, one, that of insanity, the other, that of mental irresponsibility; and that the trial court, in its conduct of the case and instructions to the jury, treated "mental irresponsibility," as used in the statutes providing for such a plea as that herein made by appellant, as synonymous with "insanity," and thereby committed error to appellant's prejudice. Appellant argues that, under his plea of "mental irresponsibility," it was not necessary to show a diseased condition of the mind, which had resulted in complete obliteration of the reasoning faculty, or that, under such a plea, only two verdicts were possible, one, guilty of murder the first degree; the other, not guilty by reason of insanity.

In other words, appellant seeks to differentiate between "insanity" and "mental irresponsibility," as used in the statutes providing for such a plea in a criminal proceeding, as was here entered by appellant. The statutes providing for such a plea were referred to, and the material portions set forth, in the opinion of this court in the case of *State v. Schrader,* 135 Wash. 650, 238 Pac. 617, and in the later *En Banc*

decision rendered by this court in the same case, 135 Wash. 661. In the special plea interposed by appellant, he specifically alleged "that said insanity and mental irresponsibility, since the acts set forth in said information were committed, has ceased to exist and does not now exist, and said defendant does not now suffer from such degree of mental irresponsibility or insanity."

The questions presented by appellant upon this branch of the case were considered by this court *En Banc* in the case of *State v. Schafer*, 156 Wash. 240, 286 Pac. 833. In the course of its opinion, this court said:

"The term 'mental irresponsibility,' as used in the statute alternatively with plain insanity, of course means something less than total or permanent insanity. Nevertheless, it implies nothing but what is defined in law as criminal insanity: That is, whether there was mental capacity and moral freedom to do or abstain from doing the particular act."

Appellant argues that, under such a special plea as was interposed by appellant, the jury should be permitted, under proper instructions, to find the accused "not guilty by reason of insanity," or to find him guilty of murder in the second degree, because of some supposed mental irresponsibility which would render the accused incapable of a premeditated murder, for which he could be convicted of murder in the first degree, but which would render appropriate a verdict of murder in the second degree. We cannot agree with appellant's contention. It seems to us clear that, in using the terms "insanity," and "mental irresponsibility," the legislature intended the same thing, that is, a mental condition because of which the accused was incapable of committing a crime because insane or mentally irresponsible. The trial court

did not err in the construction placed by it upon appellant's plea, and in refusing to recognize any distinction between insanity and mental irresponsibility.

In the course of the trial, a serious question arose upon the admission of evidence. John Eden, called as a witness on behalf of appellant, testified that he had resided in the city of Walla Walla for twelve years, during all of which period he had worked with appellant at the brewery, and that, while he did not work in the cellar with appellant, he saw him often and sometimes worked with him five or ten minutes at a time. In response to questions by appellant's counsel, the witness testified that appellant was a good workman and that the witness liked to work with him; that appellant was popular with his associates, and that his conduct was always good up to about two weeks prior to the killing; that, during this two weeks period, he had noticed a difference in appellant's conduct, and had observed appellant standing with his head bent, talking to himself, and that appellant had gone downhill fast and "didn't know what he was doing any more;" that, on one occasion, appellant had allowed a batch of brew to freeze while he was watching it; and, again, that appellant was "half of the time out of his head." Following this testimony and the rather lengthy statement made by the witness as to his acquaintance with appellant, his observation of him, and the change in appellant which the witness had noted during the two weeks prior to March 31, appellant's counsel propounded to the witness this question:

"Now, from all he said and all you heard and your observation of his conduct, Mr. Eden, what would you say as to whether or not he was in his right mind?"

To this question, respondent's counsel objected upon the ground that there was not sufficient founda-

tion laid, and the objection was sustained. A similar question had been propounded to the witness earlier in his examination, to which question the trial court had also sustained an objection interposed by counsel for the prosecution. Appellant's counsel had thereupon examined the witness further in regard to his observation of appellant, the examination culminating in the question above quoted.

It is unquestionably the law of this jurisdiction that the testimony of nonexpert witnesses is competent to show insanity. This court, in the case of *Halbach v. Luckenbach Steamship Co.*, 152 Wash. 492, 278 Pac. 178, reversed a judgment of the trial court entered upon the verdict of a jury in favor of the defendant in an action to recover damages for personal injuries, because the trial court had refused to allow non-expert witnesses to testify concerning their opinion as to the sanity or insanity of the plaintiff. In this case, the prior decisions of this court were discussed and approved, and it was held without qualification that, while the trial court might possibly exercise some discretion in determining whether or not a witness had shown sufficient knowledge or acquaintance with the situation to permit him to express an opinion, under the facts as shown by the record no opportunity was afforded for the exercise of any discretion by the trial court, and reversible error had been committed in refusing to allow the nonexpert witnesses to express their opinions upon the question of plaintiff's mental condition. This was a civil action at law for the recovery of money, but the same rule should certainly apply to a criminal prosecution in which an accused is standing trial for his life.

Respondent argues that this court, in the case of *State v. Wilkins*, 156 Wash. 456, 287 Pac. 23, has to some extent restricted the rule, and that, under the

doctrine of the case cited, it should be held that, in the case at bar, no reversible error was committed by the trial court in sustaining objections to the questions propounded to the witness Eden. In the case of *State v. Wilkins, supra,* this court approved the rule laid down by the cases which were relied upon by this court in reversing the judgment of the lower court in the case of *Halbach v. Luckenbach Steamship Co., supra,* but concluded that, in the *Wilkins* case, the witnesses for the accused had not

". . . detailed any unusual facts or circumstances which would warrant any person in reaching the conclusion that the defendant was insane or mentally irresponsible."

It is unquestionably the rule that, before non-expert testimony as to the mental condition of a party to an action may be rendered competent, the witness must show an acquaintance with the party concerning whose mental condition he is testifying, of such intimacy and duration as to clearly indicate that he was well enough acquainted with such person to render his testimony of value in determining the issues presented for decision; and he must also testify as to the certain specific acts of such person which form the basis for his conclusion as to the mental condition of such person. It must be held that the testimony of the witness Eden fulfills these conditions. He had known and worked with appellant for twelve years, and testified that, during the period of two weeks prior to March 31, a change had apparently come over appellant, concerning which the witness testified specifically and at length.

Under the prior decisions of this court, it must be held that, in the case at bar, the trial court committed

reversible error in sustaining the objection to the question propounded to the witness Eden.

Appellant complains of certain questions propounded to him on cross-examination. Appellant having introduced the testimony of his friends and neighbors to the effect that his reputation was good, counsel for the state, on cross-examination, asked appellant if he had not had a fight with a policeman at a certain place indicated in the question. Appellant admitted the fight, but denied that he at the time thought his antagonist was a police officer. As to whether or not this contest had resulted in appellant's arrest, the trial court sustained an objection interposed by appellant to questions propounded by counsel for respondent. Appellant was then asked whether or not, about twelve years before the trial, he had chased a little girl along Division street, the girl seeking the protection of another man, who told appellant to go about his business, which resulted in a warm interchange of words between appellant and the child's protector. Appellant was also asked whether or not, about four years prior to the trial, he had, holding a knife in his hand, in the presence of one Hull, chased his daughter from the house. The two incidents last referred to were denied by appellant, and respondent later called Mr. Hull and sought to interrogate him as to the incident last above referred to.

The trial court properly sustained appellant's objection to the first question propounded to Mr. Hull, after the witness had stated his name, but appellant contends that the mere calling of Mr. Hull and questioning him in the presence of the jury as to the alleged incident concerning trouble between appellant and his daughter constituted misconduct on the part of the state, of which appellant can now take advantage.

The trial court correctly refused to allow the state to impeach appellant upon such a collateral issue as that which the prosecution had endeavored to interject into the case by its cross-examination of appellant, but we do not think that the calling and swearing of the witness Hull, and the propounding of the question to him, would constitute reversible error, although, after the trial court had advised counsel for the state that appellant's testimony could not be impeached upon such a matter, the better practice would have been for counsel for the prosecution to have argued to the court, in the absence of the jury, that testimony such as he desired to offer was proper, rather than to parade the witness in the presence of the jury and force appellant to object to testimony, the nature of which was clearly indicated by the question propounded to the witness, which the trial court had indicated would be held inadmissible.

As to the question propounded to appellant in regard to his having chased a little girl up the street twelve years before the trial, we cannot say that the asking of the question constituted prejudicial error, although it is hard to understand how such an incident could have had any reasonable bearing upon the situation which was presented to the jury for determination. As to such cross-examinations, it must be held that the trial court has a large discretion in permitting or restraining the same, and before it can be held that prejudicial error has been committed, it must clearly appear that the reasonable discretion of the trial court has been abused.

Appellant also complains of certain remarks of the trial court which followed a statement by appellant applying a vulgar name to a female witness who had testified on behalf of the state. The trial court has a very large discretion in controlling a trial, and

may, within reason, take all steps necessary to see that the trial is conducted in an orderly manner and kept within the bounds prescribed by decency and the ordinary rules of good conduct which govern such proceedings. We cannot find that, in the case at bar, the trial court transcended its rights, or did or said anything not called for by an existing situation, or which resulted in any prejudice to appellant.

Some other questions are urged on behalf of appellant, but, as a new trial must be granted appellant for the reason hereinabove assigned, the other questions urged need not be discussed.

For the error of the trial court in restricting the examination of the witness Eden, the judgment appealed from is reversed, with instructions to grant appellant's motion for a new trial.

MITCHELL, C. J., PARKER, FULLERTON, HOLCOMB, TOLMAN, MILLARD, and MAIN, JJ., concur.